UNITES STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| PRECISION AIR, INC.,<br><br>        Plaintiff,<br><br>vs.<br><br>THEIA GROUP INC. and KMR AVIATION SERVICES, INC.,<br><br>        Defendants. | C.A. No. 4:21cv2446 RBH<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff Precision Air, Inc., for its complaint against Defendants, Theia Group, Inc, and KMR Aviation Services, Inc., would respectfully show unto the Court as follows:

**NATURE OF ACTION**

1.      This is a case about a fraudulent scheme by an aircraft owner to cheat an aviation maintenance company out of payment for valuable work the company performed on the owner's aircraft. Defendant Theia Group, Inc. ("TGI") agreed to have Plaintiff Precision Air, Inc. ("Precision Air") perform technical upgrades to a Jetstream aircraft owned by TGI. As Precision Air was nearing the conclusion of this work at Florence Regional Airport (FLO), TGI took the plane on what was supposed to be a test flight, yet TGI actually took the aircraft out of state so that it could have the benefit of the work Precision Air performed without paying for it. Precision Air seeks relief here to correct this manifest injustice.

**PARTIES**

2.      Plaintiff Precision Air is an Alaska Native Corporation with principal places of business in Manning and Florence, South Carolina. Precision Air provides maintenance and

modifications to aircraft. At all times relevant to this Complaint, Precision Air operated and continues to operate a Federal Aviation Authority (FAA) Part 145 Repair Station out of FLO.

3. Upon information and belief, Defendant TGI is a Delaware corporation with an aircraft facility in Albuquerque, New Mexico and an office address in Washington, D.C. TGI provides satellite and telecommunication services. According to FAA records, TGI owns the 1996 Jetstream 4101 with FAA Registration #N42AX (the "Subject Aircraft").

4. Upon information and belief, Defendant KMR Aviation Service, Inc. ("KMR") is a Virginia corporation with a principal place of business in Lynchburg, Virginia. KMR provides management and support services to airlines, aircraft owners, and maintenance providers.

## JURISDICTION

5. This Court has subject matter jurisdiction over the present case pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.

6. Venue is proper in this District pursuant to 28 U.S. Code § 1391(b)(2) and (3), as a substantial part of the events or occurrences giving rise to the claim occurred in this District and the Defendant is subject to personal jurisdiction in this District under South Carolina's long-arm statute. *See* S.C. Code Ann. § 36-2-803(a), (c), and (g).

## FACTS

7. Beginning in October 2018, Precision Air provided aircraft maintenance and upgrades as a subcontractor to KMR for various KMR clients, including TGI on the Subject Aircraft.

8. On or about March 15, 2019, TGI pilots flew the Subject Aircraft to FLO to enable Precision Air to perform maintenance on the Subject Aircraft at Precision Air's facility at FLO.

9. At that time, TGI handed over to Precision Air custody and control of the Subject Aircraft and Precision Air began maintenance on the Subject Aircraft with TGI's full knowledge and consent.

10. The work performed by Precision Air on the Subject Aircraft occurred pursuant to binding contracts between Precision Air and KMR that were documented by work orders and invoices issued by Precision Air and purchase orders issued by KMR.

11. While the Subject Aircraft was stationed at Precision Air's FLO facility, KMR requested quotes from Precision Air for avionics upgrades and installation of electrical provisions required for aircraft mission system components on the Subject Aircraft, including an Automatic Dependent Surveillance-Broadcast ("ADS-B") out system, a Universal Avionics Corporation UNS-1 Flight Management System ("FMS") upgrade, and mission equipment provisions (collectively "Engineering and Electrical Provisions Installation Work").

12. The scope of work for the Engineering and Electrical Provisions Installation Work on the Subject Aircraft included engineering designs, analysis and substantiation, parts procurement and fabrication, installation, testing, and airworthiness approval documentation. These efforts were laid out in Precision Air's Proposal submitted to KMR on or about June 11, 2019, which KMR forwarded to TGI.

13. The Proposal included a payment schedule which required a 50% deposit upon order and the remaining balance upon issuance of Substantiation Documents.

14. KMR accepted Precision Air's proposal to perform Engineering and Electrical Provisions Installation Work on the Subject Aircraft. On or about June 26, 2020, Precision Air issued invoice FLO19-01049 to KMR for the work, and KMR issued purchase orders documenting its acceptance of the terms of the proposal.

3

15. On or about August 22, 2019, KMR paid the initial deposit of $102,000 to Precision Air for the Engineering and Electrical Provisions Installation Work on the Subject Aircraft.

16. At this time, TGI again handed over to Precision Air custody and control of the Subject Aircraft and Precision Air began work pursuant to work order FLO19-01049 with TGI's full knowledge and consent.

17. All of the Engineering and Electrical Provisions Installation Work performed by Precision Air on the Subject Aircraft took place at FLO.

18. These efforts continued through June 9, 2020 when Precision Air signed off on the maintenance work on work order FLO19-01049 and provided substantiation documents for the aircraft to begin flight testing.

19. The Engineering and Electrical Provisions Installation Work on the Subject Aircraft included functional test flights as part of the installation phase of the project.

20. TGI and KMR knew that such functional flight testing was necessary and that the Subject Aircraft needed to be immediately returned to Precision Air after each test flight until all Engineering and Electrical Provisions Installation Work and deficiency corrective actions were completed. In fact, KMR issued Flight Test Procedures to Precision Air which spelled out these requirements.

21. Prior to June 24, 2020, the Subject Aircraft underwent multiple test flights. Each of these flights were short duration flights flown by TGI pilots to and from Precision Air's FLO facility and which resulted in the Subject Aircraft being returned to the custody and control of Precision Air.

4

22. In addition to conforming to specific test flight procedures, the practice of returning the aircraft to the origin airport at the conclusion of a flight test is an industry standard practice with which TGI and KMR are quite familiar.

23. Precision Air, KMR, and TGI scheduled another test flight for the Subject Aircraft to occur on June 24, 2020. The purpose of this flight was to complete functional testing on the UNS-1 modification, including validating the performance of the LPV capability. The data obtained during the test flight was to be collected by Precision Air upon return of the Subject Aircraft to FLO and then provided to a subcontracted FAA Designated Engineering Representative for review and final approval of the FMS LPV capability.

24. As with the previous tests flights, TGI and KMR knew that the Subject Aircraft had to be returned to Precision Air's facility at FLO after the test flight was completed in order for Precision Air to complete the system performance review for LPV approval and to carry out corrective action for noted discrepancies.

25. Precision Air only agreed to release the Subject Aircraft from its custody and control based on the understanding that the TGI pilots would return the Subject Aircraft to FLO so that the remaining work could be performed. Further, consistent with the terms of Precision Air's proposals, KMR and TGI both knew that full payment for Precision Air's work was due upon delivery of the aircraft and substantiation data.

26. Despite this knowledge, TGI formed a secret plan to defraud Precision Air from payment for the work Precision Air performed on the Subject Aircraft under the contracts with KMR. TGI's plan involved using the June 24, 2020 test flight as a way to permanently regain possession of the Subject Aircraft. TGI decided that during the June 24, 2020 test flight, it would instruct its test pilots to not return the Subject Aircraft to FLO. Prior to the June 24, 2020 test

5

flight, TGI rented a hangar at the Statesville, NC airport (SVH) so that TGI would have a place to store the Subject Aircraft at the end of the test flight.

27.     TGI knew that Precision Air would not have permitted the June 24, 2020 test flight to occur if Precision Air knew of TGI's plan to not return the aircraft to FLO. For that reason, TGI representatives did not disclose TGI's plan to take the Subject Aircraft to SVH at the conclusion of the test flight.

28.     In fact, TGI representatives affirmatively misled Precision Air about TGI's intention to return the Subject Aircraft to FLO. For example, immediately before the test flight on June 24, 2020, a Precision Air employee at FLO told TGI test pilot Charley Cornelius, "See you in a little while." Cornelius answered, "Yep, see you in a bit."

29.     Approximately 4 hours after the departure of the Subject Aircraft, TGI informed KMR that the Subject Aircraft had landed at SVH because TGI executives "wanted to see" the aircraft, but that the TGI pilots would return the aircraft to FLO to enable Precision Air to complete its limited remaining work.

30.     When TGI made these representations to KMR, TGI knew that KMR would relay this information to Precision Air. In fact, KMR did advise Precision Air that the Subject Aircraft landed at SVH for the reasons stated by TGI.

31.     TGI's representation that it intended to return the Subject Aircraft to Precision Air's facility was false.

32.     TGI has never returned the Subject Aircraft to the custody and control of Precision Air.

33.     In addition, despite Precision Air's demands for payment for the Engineering and Electrical Provisions Installation Work on the Subject Aircraft, neither TGI nor KMR has made

any payments to Precision Air for this upgrade since the Subject Aircraft was taken on June 24, 2020.

34. In the subsequent weeks and months, TGI acknowledged to Precision Air that the Subject Aircraft was taken prior to the work being completed and without payment of the balance due to Precision Air for the work performed under Precision Air's contracts with KMR. Furthermore, both KMR and TGI reassured Precision Air that they were working to resolve the failure to pay Precision Air for the work performed. Nonetheless, no additional payments have been made to date.

35. KMR has advised Precision Air that it cannot pay for the Engineering and Electrical Provisions Installation Work on the Subject Aircraft because TGI has not paid KMR for this upgrade.

36. The remaining balance on the outstanding invoices is $275,709.33. This amount reflects the net remaining amount owed for the work Precision Air performed on Subject Aircraft including providing the equipment and technical data and performing the engineering, labor, and maintenance.

37. Upon information and belief, while stationed at SVH, TGI took the steps to complete the limited remaining work on the Subject Aircraft.

38. Upon information and belief, TGI has been flying the Subject Aircraft in United States Air Space and benefitting from the Engineering and Electrical Provisions Installation Work performed by Precision Air without paying for Precision Air's work on the Subject Aircraft.

**FOR A FIRST CLAIM**
**(CONVERSION -- Against Defendant TGI)**

39. Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

7

40. Plaintiff has an interest in the equipment it installed on the Subject Aircraft.

41. TGI unlawfully converted to its personal benefit and use the equipment owned by Plaintiff on the Subject Aircraft.

42. TGI did not have permission to convert this equipment without ensuring that Plaintiff was paid the balance due for the work it performed and the equipment it installed on the Subject Aircraft.

43. TGI's conversion was unlawful, intentional, willful, reckless, in conscious disregard of Plaintiff's rights.

44. Plaintiff suffered injuries and harm proximately caused by TGI's unlawful conversion of Plaintiff's equipment.

45. Plaintiff is entitled to actual, special, consequential, and punitive damages and interest on ascertainable amounts plus costs incurred.

### FOR A SECOND CLAIM
### (FRAUD/CONSTRUCTIVE FRAUD – Against Defendant TGI)

46. Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

47. Through its conduct and its representations made prior to the June 24, 2020 test flight, TGI affirmed that it would return the Subject Aircraft to Precision's Air custody and control at the conclusion of that test flight.

48. TGI knew that its conduct and representations were false, as TGI did not intend to return the Subject Aircraft to Precision's Air custody and control, but rather intended to immediately obtain permanent possession of the Subject Aircraft for itself to avoid paying KMR for the work Precision Air performed on the Subject Aircraft.

49. Precision Air would not have surrendered possession, custody, and control of the Subject Aircraft if it knew that TGI did not intend to return the Subject Aircraft from the test flight. TGI was aware of this and therefore intended for Precision Air to act upon TGI's deception and misrepresentations.

50. Precision Air had a right to rely on TGI's conduct and representations.

51. As a direct and proximate result of Precision Air's reliance on TGI's fraudulent misrepresentations and conduct, Precision Air has suffered the following injuries:

    a. Precision Air has not been paid the remaining balance on its outstanding invoices of $275, 709.33, which was due upon delivery of the aircraft and substantiation data.

    b. Precision Air lost possession of the property it had installed on the Subject Aircraft.

    c. Precision Air lost the ability to assert a repairman's lien under S.C. Code Ann. § 29-15-10 because such lien requires Precision Air to have possession of the Subject Aircraft

52. Upon information and belief, TGI's conduct was sufficiently willful, wanton, reckless, grossly negligent, and outrageous to entitle Precision Air to punitive damages in an amount to be determined by a jury, for which TGI is liable.

### FOR A THIRD CLAIM
### (BREACH OF CONTRACT – Against Defendant KMR)

53. Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

54. Precision Air and KMR were parties to work order FLO19-01049, as well as other work orders and purchase orders, which were legally enforceable and binding contracts pursuant to which KMR agreed to pay Precision Air for its work performed on the Subject Aircraft.

9

55.     Although Precision Air has performed its obligations under its contracts with KMR, KMR has breached its obligations under the contracts by failing to pay Precision Air for the work Precision Air performed on the Subject Aircraft.

56.     KMR's breaches of the contracts have caused Precision Air actual damages of $275,709.33, prejudgment interest on the foregoing amount, plus costs, which Precision Air is entitled to recover from KMR.

**WHEREFORE**, Plaintiff prays that it be granted judgment against Defendants jointly and severally (a) for actual damages, including but not limited to $275,709.33, (b) prejudgment interest on the foregoing amount, (c) punitive damages, (d) costs, and (e) for such other and further relief as may be just and proper.

Respectfully Submitted,

*/s/ James E. Cox, Jr.*
WYCHE, P.A.
Alice W. Parham Casey (Fed. I.D. #9431)
James E. Cox, Jr. (Fed. I.D. #13054)
tcasey@wyche.com
jcox@wyche.com
Post Office Box 12247
Columbia, South Carolina 29211
Telephone: 803-254-6542
Telecopier: 803-254-6544

Douglas Proxmire *(Pro Hac Vice Application Forthcoming)*
Carly M. Celestino *(Pro Hac Vice Application Forthcoming)*
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Tysons Corner, VA 22182
Tel: (703) 905-1459
Fax: (703) 821-8949
dcproxmire@venable.com
cmcelestino@venable.com

*Counsel for Plaintiff*